IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:16-CV-323-D

| | |
|---|---|
| ARTHUR LEE EVERETT, JR., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> KATRINA REDMON, individually and ) <br> in her official capacity as the Chief ) <br> Executive Officer of the Housing Authority ) <br> of the City of Wilmington, North Carolina; ) <br> MATT SCAPARRO, individually and in ) <br> his official capacity as the Director of ) <br> Property Management for the Housing ) <br> Authority of the City of Wilmington; ) <br> LEASHA JOHNSON, individually and in ) <br> her official capacity as a Property Manager ) <br> for the Housing Authority of the City of ) <br> Wilmington, ) <br> ) <br> Defendants. ) | **ORDER** |

On September 13, 2016, Arthur Lee Everett, Jr., ("Everett" or "plaintiff") sued Katrina Redmon ("Redmon"), individually and in her official capacity as the Chief Executive Officer of the Housing Authority of the City of Wilmington, North Carolina; Matt Scaparro ("Scaparro"), individually and in his official capacity as the Director of Property Management for the Housing Authority of the City of Wilmington; and Leasha Johnson ("Johnson"), individually and in her official capacity as a Property Manager for the Housing Authority of the City of Wilmington (collectively, "defendants") [D.E. 1]. On November 1, 2016, defendants moved to dismiss Everett's complaint for failure to state a claim upon which relief can be granted [D.E. 11] and filed a memorandum in support [D.E. 12]. On January 6, 2017, Everett responded in opposition [D.E. 31].

As explained below, the court grants defendants' motion to dismiss and dismisses Everett's complaint without prejudice.

I.

Everett is an African-American male who resides in Brunswick County, North Carolina. Compl. [D.E. 1] ¶¶ 7, 14. In 2001, the Housing Authority of the City of Wilmington, North Carolina ("the Housing Authority") hired Everett as a maintenance mechanic, and he served in that capacity until January 15, 2014. Id. ¶¶ 16–17.[1] On January 15, 2014, Everett was promoted to serve as lead maintenance mechanic. Id. ¶ 16.

Redmon resides in New Hanover County, North Carolina. Id. ¶ 8. In August 2014, Redmon became the Housing Authority's Chief Executive Officer ("CEO"). Id. ¶¶ 8, 25. As CEO, Redmon "serve[d] as primary advisor to the [Housing Authority] Board of Commissioners . . . and [was] charged with managing and directing all functions of the Authority in accordance with all applicable laws, rules and regulations, including rules promulgated by [the United States Department of Housing and Urban Development], as well as resolutions and policies adopted by the Board and any other body with power over the Authority." Id. ¶ 8 (quotation omitted).

Scaparro resides in New Hanover County, North Carolina. Id. ¶ 9. During the events at issue in this case, Scaparro was the Housing Authority's Director of Property Management. Id. His job duties included

> (1) The overall organizing, staffing, monitoring and reporting functions in the property management department; (2) Recommending changes in policies and procedures, and implementing policies and procedures; (3) Coordinating the Housing Authority's safety program to insure compliance with applicable state and federal requirements and regulations; (4) Monitoring the operations of the maintenance staff

---

[1] The Housing Authority is a municipal corporation organized under North Carolina law. See Evans v. Hous. Auth. of City of Raleigh, 359 N.C. 50, 53, 602 S.E.2d 668, 670 (2004).

and contractors . . . ; and (5) evaluating and recommending personnel action on subordinates' job performance.

Id. (quotation omitted).

Johnson resides in New Hanover County, North Carolina. Id. ¶ 10. During the events at issue in this case, Johnson was the Housing Authority's Property Manager for the Housing Authority's Houston Moore and Vesta Village properties. Id. Her job duties included "recommend[ing] termination and disciplinary action, if needed" for "assigned property staff," "[d]irecting all vendors and contractors that are on site completing work," and "addressing potential hazards." Id. Johnson was Everett's direct supervisor and "was charged with evaluating [Everett's] job performance and recommending termination or other disciplinary actions." Id.

On Wednesday, November 18, 2015, a contractor named William Vereen, nicknamed "Blue," with Top Notch Cleaning Service asked Everett to accompany him to a work site in an apartment in Houston Moore to "look at some damaged floor tiles." Id. ¶ 18. Everett met Blue at the site and walked to an apartment. Id. Once inside, Blue asked Everett if the material underneath some displaced floor tiles contained asbestos. Id. Everett told Blue to ask Johnson, escorted Blue to Johnson's office, and then left to resume other work. Id. ¶¶ 18–19. Johnson called Everett, told him to return to the apartment, and asked "what 'Blue' [was] talking about, if there's asbestos in the floor." Id. ¶ 19. Everett asked if Blue was still in Johnson's office, and Johnson responded "yes." Id. Unbeknownst to Everett, Johnson had put the call on speakerphone, and Blue could hear Everett. Id. Everett responded that he believed the material beneath the floor tiles in the apartment was asbestos. Id. Upon hearing Everett's comment, Blue accused Everett "of knowing the unit had asbestos and failing to tell him." Id.

On Thursday, November 19, 2015, Johnson held a meeting which Scaparro, Everett, and

3

Director of Human Resources Vernice Hamilton ("Hamilton"). Id. ¶ 20. Scaparro said that Everett had told Blue that the material beneath the floor tiles was asbestos. Id. Scaparro expressed concern about the costs of widespread asbestos throughout the Houston Moore property and said "I can't afford every time a move out comes up to have Environmental take up the tile and the contractor put down new tile, I'll go broke. We don't have any money for that." Id. ¶ 21. Scaparro told Everett that he should have told Blue "[h]e didn't know if it was asbestos." Id. ¶¶ 20–21. Everett claimed he initially did not tell Blue that the material was asbestos, referred Blue to Johnson, and stated that the material was asbestos only when he was on the phone with Johnson and Blue. Id. ¶¶ 19–20. Scaparro and Johnson ended the meeting and admonished Everett for not telling Blue that the material beneath the floor tiles contained asbestos when he believed that it did. Id. ¶ 20.

After the meeting, Johnson instructed Everett to assist Eastern Environmental with assessing the composition of the material under the floor tiles in the apartment in question. Id. ¶ 22. Everett complied, but the Housing Authority did not provide him with "even rudimentary protective gear." Id.

On Monday, November 23, 2015, Johnson called Everett to her office for a meeting with herself and Scaparro. Id. ¶ 23. Scaparro told Everett that Everett would be sent home while Scaparro investigated Everett's conduct. Id. At 3:30 p.m. that day, Everett met with Scaparro in Hamilton's office. Id. Scaparro told Everett that Everett's employment was terminated because of "a willful violation of material facts regarding the possibility of asbestos located at Houston Moore." Id. ¶ 24.

Following his termination, Everett sought unemployment benefits. Id. ¶ 27. The North Carolina Employment Security Commission ("ESC") initially denied Everett's request for unemployment benefits after determining that Everett had been fired for "misconduct connected with

4

work." Id. An employee who is discharged for misconduct connected with work is ineligible for unemployment benefits. See N.C. Gen. Stat. § 96-14.6.[2] During the ESC proceeding, the Housing Authority said that Everett had been "discharged for failing to inform the contractor of the presence of the asbestos." Compl. ¶ 27. Everett appealed the decision, and the ESC's Appeals Referee determined that Everett "reasonably followed [the Housing Authority's] policies as he understood them and performed his job to the best of his ability"; therefore, he had not been discharged for misconduct connected with work and was eligible for unemployment benefits. Id.

On September 13, 2016, Everett filed a complaint in this court against Redmon, Scaparro, and Johnson in their individual and official capacities [D.E. 1]. On November 1, 2016, defendants moved to dismiss Everett's complaint [D.E. 11] and filed a memorandum in support [D.E. 12]. On January 6, 2017, Everett responded in opposition [D.E. 31].

II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80, 684 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the

---

[2] Under North Carolina unemployment law, to engage in misconduct related to work, the employee must "evinc[e] a willful or wanton disregard of the employer's interest as found in a deliberate violation or disregard of standards of behavior that the employer has the right to expect of an employee or has explained orally or in writing to an employee" or "evinc[e] carelessness or negligence of such degree or recurrence as to manifest an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to the employer." N.C. Gen. Stat. § 96-14.6(b).

5

facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 347, 352–53 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's allegations must "nudge[ ] [his] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausib[ility]." Iqbal, 556 U.S. at 678–79.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co., 637 F.3d at 448; see Fed. R. Civ. P. 10(c); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may take judicial notice of public records without converting the motion to dismiss into a motion for summary judgment. See, e.g., Fed. R. Evid. 201(d); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

III.

Everett's complaint contains seven claims. Count one alleges a violation of 42 U.S.C. § 1981, count two alleges a violation of 42 U.S.C. § 1983, count three alleges a violation of 42 U.S.C. § 1985, count four alleges a violation of 42 U.S.C. § 1986, count five alleges that Redmon negligently supervised Scaparro and Johnson, count six alleges that defendants defamed Everett, and count seven alleges intentional infliction of emotional distress. See Compl. ¶¶ 34–84. In Everett's response in opposition to the motion to dismiss, he withdrew counts one, three, four, and six. [D.E. 31] 18, 39. Of the remaining counts, the court has original jurisdiction over count two and supplemental jurisdiction over counts five and seven. See 28 U.S.C. §§ 1331, 1367.

Although represented by counsel, Everett's complaint is not a model of clarity. To state a

6

section 1983 claim, a plaintiff must plausibly allege "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." Jenkins v. Medford, 119 F.3d 1156, 1159–60 (4th Cir. 1997) (en banc); West v. Atkins, 487 U.S. 42, 48 (1988); see Philips, 572 F.3d at 180.

Count two of Everett's complaint lists nearly every imaginable source of law as the basis for his section 1983 claim, including the

> rights, privileges, and immunities secured to him by the United States Constitution, the laws of the United States and the State of North Carolina. These rights include, but are not limited to; [Everett's] rights under the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution . . . . [R]ights to due process of law and equal protection under the law, as well as his rights to work in an environment free of unlawful discrimination and retaliation based on the impermissible considerations of race . . . . [His] right of free speech, his right to personal security, and his right not to be deprived of the well-established liberty interests he possesses in his reputation and the making and enforcement of contracts without due process of law

as well as 42 U.S.C. § 1981. Id. ¶¶ 45–46, 48. Everett's complaint does not refine his claims beyond those broad statements or specify how Everett believes each defendant violated any specific constitutional provision or federal statute. Everett's response in opposition to defendants' motion to dismiss, however, offers some clarification. Specifically, Everett argues only that defendants fired Everett because of his race in violation of section 1981 and retaliated against him for protected speech in violation of section 1981. See [D.E. 31] 17–21, 34–38. Therefore, the court analyzes Everett's section 1983 claim as being premised on defendants' alleged violation of section 1981 by firing Everett on the basis of his race and in retaliation for protected speech concerning a violation of section 1981.[3]

---

[3] A claim under 42 U.S.C. § 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735 (1989); see Dennis v. Cty. of Fairfax, 55 F.3d 151, 156

7

A.

To the extent Everett has sued Redmon, Scaparro, and Johnson in their official capacities as officers of the Housing Authority, a claim against a public official sued in his official capacity is "essentially a claim against" the government entity the official represents. See Kentucky v. Graham, 473 U.S. 159, 165–66 (1985); Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 307 n.13 (4th Cir. 2006); Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004). Thus, Everett's section 1983 claim against defendants in their official capacities is functionally brought against the Housing Authority. Accordingly, Everett's official-capacity claims against Scaparro and Johnson duplicate the official-capacity claim against Redmon and are dismissed as duplicative. See, e.g., McDonald v. Suggs, No. 5:07-CV-339-D, 2008 WL 2129860, at *4 (E.D.N.C. May 20, 2008) (unpublished).

The Housing Authority is a municipal entity under section 1983. See Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 690 (1978); Farmer v. Wilson Housing Authority, 393 F. Supp. 2d 384, 387 (E.D.N.C. 2004). Municipal entities may not be held liable under section 1983 solely because they employed a tortfeasor. Rather, when a municipal entity is sued—directly or through an official-capacity suit—the plaintiff must plausibly allege that a "policy or custom" attributable to the municipal entity caused the violation of the plaintiff's federally protected rights. See Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997); Hafer v. Melo, 502 U.S. 21, 25 (1991); Graham, 473 U.S. at 166; Monell, 436 U.S. at 690–94; King v. Rubenstein, 825 F.3d 206,

---

& n.1 (4th Cir. 1995); Sasser v. City of Whiteville, No. 7:10-CV-95-D, 2010 WL 4809039, at *2 (E.D.N.C. Nov. 18, 2010) (unpublished); Roberson v. City of Goldsboro, 564 F. Supp. 2d 526, 528–29 (E.D.N.C. 2008). Under 42 U.S.C. § 1981(a), "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 prohibits racial discrimination in making or enforcing a contract and provides a remedy for a person who claims race discrimination in making or enforcing a contract or for retaliation in response to complaining about a violation of section 1981. See CBOCS W., Inc. v. Humphries, 553 U.S. 442, 445–46 (2008).

8

223 (4th Cir. 2016); Santos v. Frederick Cty. Bd. of Comm'rs, 725 F.3d 451, 469–70 (4th Cir. 2013); Carter v. Morris, 164 F.3d 215, 218–19 (4th Cir. 1999). A violation results from a municipal entity's "policy or custom" if the violation resulted from "a policy statement, ordinance, regulation, . . . [or] decision officially adopted and promulgated by that body's officers," or a governmental "custom." Monell, 436 U.S. at 690–91; see City of St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988).

Not every municipal official's action or inaction represents municipal policy. Rather, the inquiry focuses on whether the municipal official possessed final policymaking authority under state law concerning the action or inaction. See, e.g., McMillan v. Monroe Cty., 520 U.S. 781, 785–86 (1997); Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986); Riddick v. Sch. Bd. of the City of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000). Furthermore, even if a section 1983 plaintiff can identify the requisite final policymaking authority under state law, a municipality is not liable simply because a section 1983 plaintiff "is able to identify conduct attributable to the municipality." Riddick, 238 F.3d at 524. Instead, a section 1983 "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Brown, 520 U.S. at 404 (emphasis omitted); see City of Canton v. Harris, 489 U.S. 378, 389–90 (1989); Riddick, 238 F.3d at 524. Hence, to avoid imposing respondeat superior liability on municipalities, a section 1983 plaintiff must show that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Brown, 520 U.S. at 411; see Harris, 489 U.S. at 392; Riddick, 238 F.3d at 524; Carter, 164 F.3d at 218–19.

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action" or inaction. Brown, 520 U.S. at 410. Moreover, even if a section 1983 plaintiff can show the requisite

9

culpability, a section 1983 plaintiff also must show "a direct causal link between the municipal action [or inaction] and the deprivation of federal rights." Id. at 404. Deliberate indifference and causation are separate requirements. Id.

A single act of a municipal official may result in municipal liability if that official has final policymaking authority under state law concerning the act. Pembaur, 475 U.S. at 481; Lytle v. Doyle, 326 F.3d 463, 472 (4th Cir. 2003); Riddick, 238 F.3d at 523. An official has final policymaking authority if, under state law, the official has final authority "to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." Riddick, 238 F.3d at 523; see McMillan, 520 U.S. at 785–86; Lytle, 326 F.3d at 472; Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987). If an official has the discretion to decide when to hire or fire an individual employee, but does not have final authority to make policy regarding "employer–employee relations," that official is not a policymaker with respect to individual discretionary decisions regarding employment policy. Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 966 (4th Cir. 1995) ("The discretion to hire and fire does not necessarily include responsibility for establishing related policy. And it is the municipality's policies, not the subordinate's departures from them, that must underlie municipal liability in such instances.") (quotations and alteration omitted)). If a municipal policy gives an official discretion, and that official exercises his discretion in a manner the violates federal law, "the decision to act unlawfully would not be a decision of the" municipality. Id. (quotation omitted); see McMillan, 520 U.S. at 785–86; Pembaur, 475 U.S. at 483 n.12.

Everett argues that the Housing Authority fired him as a result of Redmon's acts as an official policymaker. See Compl. ¶ 50. In support, Everett cites the broad definition of the CEO's duties within the Housing Authority. See id. ¶ 8. Everett does not, however, allege that Redmon had the

10

final policymaking authority under state law concerning employment policies, including employee termination. Rather, in his response in opposition to the motion to dismiss, Everett cites the Housing Authority's Personnel Manual, which states that "[t]he Director of Human Resources and the Department Director with the approval of the Chief Executive Officer shall be responsible for . . . . making recommendations regarding hiring [and] terminations." [D.E. 31] 24 (emphasis added). The Personnel Manual, in turn, states that the CEO "shall have the authority and responsibility for administering the operations for the [Housing] Authority in accordance with the policies laid down by the Board." Id. Thus, Everett has failed to state a claim against Redmon in her official capacity. See, e.g., Pembaur, 475 U.S. at 483 n.12; Greensboro Prof'l Fire Fighters Ass'n, Local 3157, 64 F.3d at 966. Moreover, even if Everett plausibly alleged that Redmon used her discretion under the Housing Authority's employee-termination policies to discriminate against Everett on the basis of race or in retaliation for complaining about race discrimination, Everett has failed to plausibly allege that Redmon was acting according to Housing Authority policy. See Pembaur, 475 U.S. at 483 n.12; Greensboro Prof'l Fire Fighters Ass'n, Local 3157, 64 F.3d at 966. Accordingly, Everett's official-capacity claim against Redmon fails.[4]

---

[4] To the extent Everett argues that Johnson followed an unconstitutional policy or custom by failing to provide Everett with sufficient protective gear when sending him to work sites containing asbestos, that claim fails for at least two reasons. Cf. Compl. ¶ 51(e). First, under section 1981, the claim must involve race discrimination concerning a contract or retaliation for complaining about race discrimination concerning a contract. See Humphries, 553 U.S. at 445–46. The claim concerning lack of protective gear qualifies as neither. Second, and in any event, according to Everett's complaint, Thursday, November 19, 2015, was the only time Johnson ever told Everett to go to a work site without adequate protective gear. See Compl. ¶ 22. The complaint, however, does not plausibly allege that a policy or custom attributable to the Housing Authority caused the alleged violation or that Johnson had final policymaking authority under state law to set and implement general policy of the Housing Authority concerning protective gear. Thus, the claim fails. See, e.g., Pembaur, 475 U.S. at 483 n.12; Greensboro Prof'l Fire Fighters Ass'n, Local 3157, 64 F.3d at 966.

11

B.

As for Everett's section 1983 claim against Redmon, Scaparro, and Johnson in their individual capacities, Everett alleges race discrimination in violation of section 1981 and retaliation in violation of section 1981. As for Everett's race-discrimination claim, "the framework of proof for disparate treatment claims . . . is the same for actions brought under Title VII, or [section] 1983, or both statutes." Mallory v. Booth Refrigeration Supply Co., 882 F.2d 908, 910 (4th Cir. 1989); see Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989), superseded by statute on other grounds by 42 U.S.C. § 1981(b); Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 & n.4 (4th Cir. 2005). The elements of a discrimination claim under section 1981 are that the plaintiff (1) was a member of the protected class; (2) suffered adverse action concerning the making or enforcement of a contract; and (3) suffered the adverse action because of intentional race discrimination. See Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006); Anderson, 406 F.3d at 268. "[N]aked allegations" of a causal connection between the plaintiff's race and the alleged discrimination do not state a plausible discriminatory treatment claim. See McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585–86 (4th Cir. 2015) (quotation omitted); see Painter's Mill Grille, LLC v. Brown, 716 F.3d 342, 349–50 (4th Cir. 2013); Francis v. Giacomelli, 588 F.3d 186, 195–96 (4th Cir. 2009). Facts merely "consistent with" race discrimination cannot by themselves "support a reasonable inference that the decisionmakers were motivated by bias." McCleary-Evans, 780 F.3d at 586; see Brown, 716 F.3d at 349–50; Francis, 588 F.3d at 195–96.

Everett has not plausibly alleged a causal connection between his race and his termination. For example, he does not allege that a similarly situated white employee was treated differently. Cf. McCleary-Evans, 780 F.3d at 585–86; Lightner v. City of Wilmington, 545 F.3d 260, 263–65 (4th

Cir. 2008). Rather, the only factual assertions in Everett's complaint concerning race discrimination are that "since becoming the CEO of the Housing Authority in August 2014, [Redmon] has fired or forced out at least twenty-eight (28) employees" of which 20 were black or African-American. See Compl. ¶ 25. Everett also alleges that, during Redmon's tenure as CEO, "several African-American or Black former Housing Authority employees have provided evidence to the EEOC, and provided written statements to local newspapers and the Board, accusing the Housing Authority of discrimination and retaliation against African-American or Black employees for complaining about occurrences of racially discriminatory employment actions." Id. ¶ 28.

Everett does not allege that any of those employees were in fact fired because of their race. Instead, Everett claims in his memorandum in opposition to defendants' motion to dismiss that he cannot know whether the Housing Authority's termination of other employees was racially motivated unless he is granted discovery to search through the Housing Authority's records. See [D.E. 31] 21–22. The Federal Rules of Civil Procedure do not permit such a fishing expedition. See, e.g., Twombly, 550 U.S. at 570; Iqbal, 556 U.S. at 678–79; McCleary-Evans, 780 F.3d at 585–88; Brown, 716 F.3d at 349–50; Francis, 588 F.3d at 195–96. Unless a plaintiff alleges facts that push his claim over the line from mere possibility into plausibility, his claim cannot survive a motion to dismiss. See, e.g., Twombly, 550 U.S. at 570; Iqbal, 556 U.S. at 678–79; McCleary-Evans, 780 F.3d at 585–88; Brown, 716 F.3d at 349–50; Francis, 588 F.3d at 195–96. Thus, the court dismisses Everett's section 1983 race-discrimination claim in count two for failure to state a claim upon which relief can be granted.

As for Everett's section 1983 retaliation claim in count two, section 1981(a) provides a remedy not only for a person who claims race discrimination concerning the making or enforcement of a contract but also for a person who claims retaliation in response to his complaints about a

13

section 1981 violation. See, e.g., Humphries, 553 U.S. at 451; Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015); Bryant v. Aiken Reg'l Med. Ctr., Inc., 333 F.3d 536, 543 (4th Cir. 2003). Everett's complaint contains no direct evidence of retaliation under section 1981, and Everett proceeds under the McDonnell Douglas burden-shifting framework. See, e.g., Boyer-Liberto, 786 F.3d at 281; Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004).

To establish a retaliation claim, a plaintiff must prove that (1) he engaged in protected activity concerning a section 1981 violation, (2) the defendant took an adverse action against him, and (3) the defendant intentionally took the materially adverse action because of the protected activity. See Boyer-Liberto, 786 F.3d at 281–84; see also Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 67–70 (2006); Honor, 383 F.3d at 188. An adverse action is one that a reasonable person would find materially adverse. See, e.g., Burlington N. & Santa Fe Ry., 548 U.S. at 67–70. Employment termination qualifies as adverse action. See id.

To survive a motion to dismiss, a plaintiff alleging retaliation must plausibly allege his statutory claim, although he need not allege a prima facie case. See McCleary-Evans, 780 F.3d at 585–88. As for causation, the Fourth Circuit has held that

> [f]or status-based discrimination claims, the employee must show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision. Retaliation claims, by contrast, require the employee to show that retaliation was a but-for cause of a challenged adverse employment action.

Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216–17 (4th Cir. 2016) (citations and quotations omitted). Thus, to state a retaliation claim, a plaintiff must plausibly allege a but-for causal connection between the plaintiff's protected activity and the alleged retaliation. See id. Naked allegations of a causal connection between a plaintiff's protected activity and the alleged retaliation do not state a plausible retaliation claim. See McCleary-Evans, 780 F.3d at 585–88.

14

Everett fails to state a plausible retaliation claim in count two. Everett has not alleged that he either made a protected statement to the defendant–decisionmaker or that the defendant–decisionmaker knew that Everett had made a protected statement to someone else. See Compl. ¶¶ 44–53. A plaintiff cannot plausibly allege a but-for causal connection between his protected activity and the defendant's adverse action without alleging that the decisionmaker taking the adverse action knew that the plaintiff had engaged in protected activity. See Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007); Hooven-Lewis v. Caldera, 249 F.3d 259, 278 (4th Cir. 2001); Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998); see also Conrad v. CSX Transp., Corp., 824 F.3d 103, 108 (4th Cir. 2016); Gestamp S.C., L.L.C. v. NLRB, 769 F.3d 254, 262 (4th Cir. 2014). Everett's conclusory allegations of causation cannot support a retaliation claim. Thus, the court dismisses Everett's section 1983 retaliation claim in count two for failure to state a claim upon which relief can be granted.

C.

In count five Everett alleges negligent supervision. See Compl. ¶¶ 69–72. Everett's negligent-supervision claim is based on Everett's allegation that

> The conduct of Ms. Redmon, as set forth above, constitutes a breach of the Defendant's duty to Mr. Everett to exercise diligence and oversight in training and supervising Defendants Scaparro and Johnson and others on excluding race as a consideration when making tangible employment decisions that adversely impact the terms and conditions of the employment relationship of African-American or Black employees, like Mr. Everett.

Id. ¶ 70.

To state a negligent-supervision claim under North Carolina law, a plaintiff must plausibly allege "that the incompetent employee committed a tortious act resulting in injury to [the] plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency."

15

Smith v. Privette, 128 N.C. App. 490, 494–95, 495 S.E.2d 395, 398 (1998) (quotations omitted); see Smith v. First Union Nat'l Bank, 202 F.3d 234, 249–50 (4th Cir. 2000). Everett cannot rely on 42 U.S.C. § 1983 as the underlying "tortious act" because that alleged violation is not a common-law tort under North Carolina law. See, e.g., McLean v. Patten Cmtys, Inc., 332 F.3d 714, 719 (4th Cir. 2003); Jackson v. FKI Logistex, 608 F. Supp. 2d 705, 707–08 (E.D.N.C. 2009). Thus, Everett has failed to allege an underlying tortious act, and Everett's negligent-supervision claim fails.

D.

In count seven, Everett alleges intentional infliction of emotional distress. See Compl. ¶¶ 80–84. Specifically, Everett alleges:

> The Defendants possessed actual authority over Mr. Everett's job performance and work assignments. The Defendants, by their own admissions, knew potentially cancerous composite materials consisting of asbestos existed beneath the floor tiles of occupied Houston Moore housing units. Nevertheless, the Defendants suffering from an entire want of care, deliberately disregarded the presence of asbestos beneath the floor tiles and permitted unsuspecting tenants and unprotected employees, like Mr. Everett, to live and work in an environment laden with asbestos. Moreover, the Housing Authority's attorney branded Mr. Everett a "liability" because he failed to actively conceal the existence of asbestos beneath the floor tiles in occupied Houston Moore housing units. Defendant Scaparro encapsulated the Housing Authority's deliberate disregard for the health and safety of others when he stated, "I can't afford every time a move out comes up to have Environmental take up tile and the contractor put down new tile, I'll go broke. We don't have any money for that."

Id. ¶ 81.

To state a claim of intentional infliction of emotional distress ("IIED" claim), Everett must plausibly allege that: (1) the defendant engaged in extreme and outrageous conduct; (2) the conduct was intended to cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress. See Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992). To be considered "extreme and outrageous," the conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

16

intolerable in a civilized community.'" Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 493, 340 S.E.2d 116, 123 (1986) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Whether conduct qualifies as "extreme and outrageous" is a question of law for the court. See, e.g., Lenins v. K-Mart Corp., 98 N.C. App. 590, 599, 391 S.E.2d 843, 848 (1990).

Under North Carolina law, it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to support an IIED claim. See, e.g., Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 544–45 (E.D.N.C. 2008) (collecting cases); Efird v. Riley, 342 F. Supp. 2d 413, 427 (M.D.N.C. 2004); Thomas v. N. Telecom, Inc., 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000); Atkins v. USF Dugan, Inc., 106 F. Supp. 2d 799, 810–11 (M.D.N.C. 1999). "[L]iability clearly does not extend to mere insults, indignities, [or] threats . . . ." Hogan, 79 N.C. App. at 493, 340 S.E.2d at 123 (citing Restatement (Second) of Torts § 46 cmt. d (1965)). Rather, "[i]n cases where North Carolina courts have found IIED claims actionable, the conduct has been extremely egregious, and involved sexual advances, obscene language, and inappropriate touching." Bratcher, 545 F. Supp. 2d at 545 (collecting cases); see Moody-Williams v. LipoScience, 953 F. Supp. 2d 677, 683 (E.D.N.C. 2013); see also Payne v. Whole Foods Mkt. Grp., Inc., 812 F. Supp. 2d 705, 710 (E.D.N.C. 2011), aff'd, 471 F. App'x 186 (4th Cir. 2012) (per curiam) (unpublished).

Everett does not plausibly allege that defendants directed any sexual or racial harassment, threats of physical or emotional harm, physical contact, or other similar misconduct at him, and Everett does not base his IIED claim on such conduct. See Compl. ¶¶ 80–84. As a matter of law, defendants' alleged conduct is not extreme and outrageous conduct. See, e.g., Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 774 (4th Cir. 1997); Moody-Williams, 953 F. Supp. 2d at 682–84; Payne, 812 F. Supp. 2d at 710; Bratcher, 545 F. Supp. 2d at 544–45; Sims-Campbell v. Welch, 769 S.E.2d

643, 648–49 (N.C. Ct. App. 2015); Hogan, 79 N.C. App. at 493–94, 340 S.E.2d at 122–23. Thus, Everett's IIED claim fails.

IV.

In sum, defendants' motion to dismiss [D.E. 11] is GRANTED, and the complaint is DISMISSED without prejudice.

SO ORDERED. This  26  day of May 2017.

JAMES C. DEVER III
Chief United States District Judge